## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH HACKETT                   :
   Plaintiff,                   :
                                :        **No. 3:21-cv-00328 (VLB)**
   v.                         :
                                :
NICK RODRIGUEZ, et al.           :        **November 15, 2022**
   Defendants.                  :
                                :
                                :

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 27]

At the onset of the COVID-19 pandemic, Plaintiff Joseph Hackett worked in the laundry shop at Osborn Correctional Institution. He, along with several other laundry workers who have filed separate actions, contracted COVID-19 in May 2020. Hackett asserts a deliberate indifference claim under 42 U.S.C. § 1983 against Defendants Warden Nick Rodriguez, Deputy Warden Gerald Hines, Deputy Warden Nicole Thibeault, Captain "Perez," Industries Manager Ray Munroe, and Laundry Supervisor Ranee Blondin for their failure to provide personal protective equipment and to protect him from COVID-19 exposure at Osborn.

Before the Court is Defendants' Motion for Summary Judgment. For the following reasons, the Court GRANTS IN PART AND DENIES IN PART the motion.

### I.    FACTUAL BACKGROUND

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties.[1] The facts are read in the light most

---

[1] The Court cites Plaintiff's Local Rule 56(a)(2) Statement for all facts deemed admitted. Otherwise, the Court cites directly to the Exhibits.

favorable to the non-movant, Stephanie Kunkel.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.   The Parties

Joseph Hackett is a 56-year-old individual, incarcerated at Osborn Correctional Institution ("Osborn"), who works in the laundry unit.[2]  [*See* Dkt. 32-2 (L. R. 56(a)(2) Stmt.)  ¶ 28.]  From March 31, 2014 until May 8, 2020, Hackett was housed at Osborn, including in H-Block and E-Block.  [*See id.* ¶ 2.]  On May 8, 2020, the DOC transferred Hackett to Northern Correctional Institution ("Northern"), because he tested positive for COVID-19.  [*See id.* ¶¶ 48–49.]  He remained at Northern until May 20, 2020, after which the DOC transferred him back to Osborn. [*See id.* ¶ 50.]

There are six Defendants remaining in this case, all of whom held supervisory positions at Osborn during the relevant time period.[3]  At the top, Defendant Nick Rodriguez served as Osborn's Warden.  [*See id.* ¶¶ 3–4.] Defendants Nicole Thibeault and Gerald Hines served under him as Osborn's Deputy Wardens.  [*See id.* ¶ 3.]  Defendant Captain Perez oversaw Osborn's D-Block, E-Block, and H-Block as the unit manager, and his duties included supervising staff.  [*See id.* ¶ 5.]  Defendant Ray Munroe managed the production and operation of various industry shops, including the laundry shop.  [*See id.* ¶ 6.] In this capacity, he supervised 250 inmates and 10 correctional supervisors—

---

[2] The Court takes judicial notice of his age and location, which is publicly available information on the Connecticut Department of Correction's inmate search site.

[3] In its Initial Review Order, this Court dismissed claims against Commissioner Rollin Cook, Governor Ned Lamont, Industries and Commissary Head James Giglione, Industries Assistant Manager Husein.  Hackett has abandoned his claim Angel Quiros.

including Defendant Ranee Blondin, the laundry unit supervisor—but he did not have control over anything related to the housing units nor did he tour the housing units during the relevant time period.  [*See id.* ¶¶ 3, 6.]

      **B.**    <u>COVID-19 Protocols at Osborn</u>

At the beginning of the COVID-19 pandemic on March 13, 2020, Osborn went into emergency lockdown.  [*See id.* ¶ 8.]  The DOC's Central Office, including the DOC Chief Medical Officer and health services staff, issued instructions and recommendations to curtail the spread of COVID-19 throughout the prison, drawing in part on the CDC recommendations for correctional facilities.  [*See id.* ¶ 9.]  Included in these recommendations were to reduce population density through community release options; suspending visits; suspending group programs to limit inmate contact; initially, suspending use of showers; and initially, suspending use of phones while under quarantine.  [*See id.* ¶ 10.]  The Osborn staff implemented the Central Office's recommendations.  [*See id.*]

At the start of the pandemic, Osborn (under the direction of the Central Office) instituted a quarantine procedure for people suspected to have COVID-19.  [*See id.* ¶ 23.]  An individual with symptoms was sent to the medical unit, swabbed, and placed in the F-Block housing unit pending results.  If the individual got a positive swab test, the DOC transferred him to Northern, the designated COVID-positive isolation unit.  [*See id.* ¶¶ 19–20.]  On May 13, 2020, Osborn changed its procedure to conduct mass tests and designate housing units specifically for three groups: a) COVID-positive inmates, b) COVID-negative inmates, and c) inmates with no testing results.  [*See id.* ¶ 22.]  The Osborn administration regularly

3

communicated with the Central Office to determine and update protocols. [*See id.* ¶¶ 24, 32.]

Apart from quarantine procedure, the DOC adopted other protocol. Specifically, the DOC issued masks to staff, and all staff and inmates were required to wear masks while inside. [*See id.* ¶ 15.] In addition, from the start of the pandemic until May 16, 2020, the DOC's Chief Medical Officer directed all quarantined housing units to prohibit inmates from using showers. [*See id.* ¶ 11.] Individuals were instead given wash basins to be used in the cells. [*See id.* ¶ 12.]

The evidence establishing whether Defendants consistently or effectively implemented the protocols is disputed. The relevant record includes declarations from Warden Rodriguez, Deputy Warden Thibeault, Captain Perez, Hackett, and five other individuals who worked in the laundry unit: Jeffrey Walker, James Lee, Bryant Browne, Sidney Wade, and Ronald Brown.

C.   Plaintiff's Transfers and Symptoms

In April 2020, the DOC segregated inmate workers based on their jobs with the goal to preserve the prison's operations of essential functions. [*See id.* ¶ 36.] Hackett and others in the laundry unit were moved from H-Block to E-Block. [*See id.* ¶¶ 28, 38–39.] H-Block cells contain four walls, a solid door, and a "controllable" window. [Dkt. 27-8 (Def.'s Mot. Summ. J. Ex. E, Grievances) at 3 of 10.] H-Block cells, on the other hand, only have three walls with bars as the fourth wall, and no "controllable" window. [*Id.*]

At the end of April 2020, Hackett developed COVID-like symptoms. [*See* Dkt. 32-2 ¶ 46.] From April 30 until May 6, Hackett was placed in F-Block where medical

staff assessed him daily.  [*See id.* ¶ 47.]  Hackett tested positive for COVID-19 on May 7, 2020, and was transferred to Northern the following day.  At Northern, Hackett continued to receive COVID-19 assessments twice-daily.  [*See id.* ¶ 52.]  He remained at Northern until May 20, 2020.  [*See id.*]

### D.   Grievance Procedure

Administrative Directive 9.6 sets the grievance procedure for issues that are not related to medical care.  [*See id.* ¶ 58.]   By way of summary, the operative procedure requires an inmate to first attempt to resolve the issue verbally with a staff member and then, if that is unsuccessful, submit an Inmate Request Form in writing that "clearly state[s] the problem and the action requested."  [*See* Dkt. 32-2 ¶¶ 59–60.]   If, after 15 days, the informal resolution stage does not yield a satisfactory response, the inmate may file a Level 1 grievance that attaches the Informal Request Form(s).  [*Id.* ¶ 61.]  The inmate must submit the Level 1 grievance within 30 days of the incident giving rise to the grievance.  [*See id.* ¶ 62.]  Either five days after a response or 30 days after a non-response, the inmate may file a Level-2 appeal.  [*See id.* ¶ 63.]

The DOC may return a grievance "without disposition" when it is improperly filed.  This includes the failure to attempt informal resolution, explain why an Inmate Request Form is not attached, or comply with procedural requirements under § 5(E)(1) through (5) of Administrative Directive 9.6.  [*See id.* ¶ 65.]  Properly filed grievances are input into the Grievance Log, whereas those returned without disposition are not logged.  [*See id.* ¶ 66.]

In addition to Administrative Directive 9.6, the Inmate Handbook addresses the grievance process.  During the relevant time, the July 2018 Inmate Handbook was the operative version.  [*See* Dkt. 34-1 (Def.'s Reply Ex. L, Moore Decl.) ¶ 5.] With respect to the grievance process, the Handbook explains that "Administrative Remedies provide a way for you to obtain a formal disposition of an issue or a problem from the Warden or officials above the Warden when attempts at an informal resolution through the chain of command have failed."  [Dkt. 34-2 (Def.'s Reply Ex. L-1, Inmate Handbook July 2018) at 17 of 55.]  It further states that, prior to filing a grievance, an inmate must attempt to seek an informal resolution with a staff member listed on the Housing Unit bulletin board.  [*Id.*]  Absent informal resolution, any non-health related grievance "should be placed in the Administrative Remedies box located in the Main Corridor, F-Block, and Hospital 3 Unit."  [*Id.*]  For emergencies, an inmate must "[c]ontact a staff member if you have an emergency and explain the situation."  [*Id.* at 52 of 55.]

Hackett did not know the July 2018 Inmate Handbook existed.  Rather, he declares that he believed the 2017 Inmate Handbook—the handbook in his possession—was operative.  While the 2017 Inmate Handbook also directs inmates to Administrative 9.6, it specifies a different process for emergency grievances.  An emergency grievance is defined as:

> something that (1) presents a threat of death or injury to you; (2) presents a threat of disruption of the facility; (3) endangers your physical safety or health including the administering of health preserving medications or lack thereof, or (4) has become an emergency because the time is lapsing when meaningful action or decision is possible.

[Dkt. 32-3 (Pl.'s Opp'n Ex. 1, Hackett Decl.) at 9 of 9.]  The emergency grievance process does **not** require the individual to seek an informal resolution nor does it have a filing deadline.  [*See id.*]

The July 2018 Inmate Handbook requires an inmate to keep the current edition in the cell "at all times."  [*See* Dkt. 34-at 8 of 55.]  Osborn Deputy Warden Brian Moore, who submitted a declaration authenticating the July 2018 Inmate Handbook, stated, "When an update is made to the Osborn Inmate Handbook, a copy of the updated version is provided to the inmate population at Osborn."  [Dkt. 34-1 ¶ 8.]  He does not specify the manner in which the updated version is distributed, nor did he confirm Hackett received one.

  E.  <u>Plaintiff's Grievances</u>

Hackett filed a Level-1 grievance on May 24, 2020.  [Dkt. 27-8 at 2 of 10.]  He complained about the DOC's decision to move the laundry workers from H-Block cells—which had four walls, a door, and a controllable window—to E-Block cells that contained bars and no way to access fresh air.  [*Id.*]  The laundry workers were placed below the kitchen workers, many who exhibited COVID-19 symptoms.  [*Id.*]  Due to these new, unsafe conditions, Hackett contracted COVID-19 at the end of April and tested positive on May 6, 2020.  [*See id.*]  Hackett specifically stated: "This is an emergency grievance because things continue to go on that shouldn't when lives are at stake; for this reason the CN 9601 Form is not being sent because this matter must be addressed right away."  [*Id.*]  This grievance was returned without disposition on June 2, 2020.  [*Id.* at 4 of 10.]

On July 8, 2020, Hackett filed another Level-1 grievance, this time specifying he submitted an Inmate Request Form to Defendant Hines but did not receive a response within 15 days.  [*See id.* at 6–7 of 10.]  As with Hackett's first grievance, this Level-1 grievance concerns the laundry workers' transfer from H-Block to E-Block, the poor conditions and sick inmates in E-Block, and Hackett's COVID-19 diagnosis and symptoms.  [*See id.* at 8 of 10.]  This grievance was rejected on the grounds that it was filed more than 30 days after his return from Northern.  [*Id.* at 7 of 10.]  Hackett appealed this rejection.  [*See id.* at 9 of 10.]  On August 25, 2020, Warden Rodriguez sent Hackett a letter indicating his appeal would not be considered, because it was untimely.  [*See id.* at 10 of 10.]

It is undisputed that Administrative Directive 9.6 establishes filing deadlines for Hackett's complaints.  First, Hackett admits that he became aware of E-Block's unsanitary conditions on April 3, 2020, and that Administrative Directive 9.6 required him to file his grievance by May 3, 2020.  [*See* Dkt. 32-2 ¶ 68.]  Second, he admits that he was aware of the DOC's inadequate COVID-19 response at the latest by May 7, 2020 (when he tested positive for COVID-19), and that Administrative Directive 9.6 required him to file his grievance by June 6, 2020.  [*See id.* ¶ 67.]    He also admits that individuals located at Osborn and Northern successfully filed grievances during the relevant time period.  [*See id.* ¶ 77.]

## II.    PROCEDURAL BACKGROUND

Hackett filed this action on March 12, 2021, as a *pro se* plaintiff.  [Dkt. 1 (Compl.).]  His initial complaint asserted claims of deliberate indifference to health and safety in violation of the Eighth Amendment, First Amendment retaliation, and

Fourteenth Amendment equal protection violations against ten defendants (Commissioner Rollin Cook, Governor Ned Lamont, Industries and Commissary Head James Giglione, Industries Assistant Manager Husein, and the current Defendants).  [*Id.*]

On July 23, 2021, the Court issued its Initial Review Order, narrowing the number of claims and defendants.  Specifically, the Court permitted the following claims to go forward: (1) Eighth Amendment claims against Defendants Rodriguez, Hines, Thibeault, Munroe, Blondin, and Perez in their individual capacities for deliberate indifference to Plaintiff's need for personal protective equipment ("PPE") and for failure to safeguard him from exposure to COVID-19; (2) Eighth Amendment claims against Defendants Perez and Thibeault in their individual capacities based on deliberate indifference to his cell conditions in E-Block; (3) Eighth Amendment claim against Defendant Rodriguez in his individual capacity for deliberate indifference to Plaintiff's lack of access to showering; (4) Eighth Amendment claims against Defendant Rodriguez in his individual capacity for deliberate indifference to Plaintiff's medical needs by placing him in Northern quarantine after he tested positive for COVID-19; and (5) Eighth Amendment official capacity claim for an injunctive order that Plaintiff be vaccinated for COVID-19 may proceed against Defendant Quiros.  [*See* Dkt. 8 (IRO) at 23–24.]  The First and Fourteenth Amendment claims against all other defendants were dismissed.

The case proceeded forward without delay.  On February 18, 2022, Defendants moved for summary judgment on all claims.  Several weeks later, Attorney Alexander Taubes entered an appearance for Hackett.  [Dkt. 28 (Notice

3/10/22).] On April 12, 2022, Hackett filed his opposition to the motion for summary judgment. The opposition focused only on his deliberate indifference claim for failure to provide PPE and safeguard him from exposure to COVID-19.[4]

### III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of showing that there is no such factual dispute. *Liberty Lobby*, 477 U.S. at 256. A factual dispute is "genuine" if there is evidence on which "a reasonable jury could return a verdict for the nonmoving party," and a disputed fact is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. If the moving party shows that there is no genuine dispute as to any material fact, to defeat the motion the opposing party must provide "specific evidence" that such a dispute exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). In making this showing, the opposing party "may not rely on conclusory allegations or unsubstantiated speculation." *Id.*

In deciding a motion for summary judgment, the Court must view the evidence "in the light most favorable" to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). This requires the Court to believe the evidence of the nonmovant and draw "all justifiable inferences" in his favor, *Liberty*

---

[4] Hackett argues facts related to the poor E-block cell conditions and refusing access to showers are facts establishing damages, not underlying claims. [*See* Dkt. 32-1 at 5-6.] The opposition failed to mention anything concerning his quarantine at Northern, and he admits facts that establish Warden Rodriguez was not deliberately indifferent to his serious medical needs. [*See* Dkt. 32-2 ¶¶ 53-54.] Plaintiff also withdrew his claim against Defendant Quiros, as he was given the COVID-19 vaccine in March 2021. [*Id.* at 1 n.1.]

*Lobby*, 477 U.S. at 255, and to "disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Liberty Lobby*, 477 U.S. at 255.  Accordingly, summary judgment must be denied if, regarding the issue on which summary judgment is sought, the record contains any evidence from which a reasonable inference could be drawn in the opposing party's favor.  *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *see also Liberty Lobby*, 477 U.S. at 250 (stating that summary judgment is appropriate only if "there can be but one reasonable conclusion as to the verdict").  While the Court is required to consider only the cited evidence when making its decision, it has the authority to also consider other materials in the record that are not cited by the parties. Fed. R. Civ. P. 56(c)(3).

## IV.   ANALYSIS

Defendants move for summary judgment on three grounds: (1) Hackett failed to exhaust his administrative remedies, (2) Hackett failed to establish Defendants acted with deliberate indifference for failure to provide PPE and safeguard him against COVID-19, and (3) all Defendants are entitled to qualified immunity.  Hackett opposes each argument.

### A.   Exhaustion of  Administrative Remedies

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), requires a prisoner to exhaust "administrative remedies as are available" before bringing an action . . . with respect to prison conditions."  This requirement applies to all claims

pertaining to "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion of available administrative remedies must occur regardless of whether the inmate may obtain the specific relief he desires through the administrative process.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

Additionally, an inmate must "proper[ly] exhaust[ ]" his administrative remedies, which includes complying with all "critical procedural rules" (like filing deadlines) as set forth in the particular prison grievance system.  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) (proper exhaustion "means using all steps that the agency holds out . . . (so that the agency addresses the issues on the merits) . . . [and] demands compliance with agency deadlines and other critical procedural rules").  Consequently, neither "untimely" nor "otherwise procedurally defective attempts to secure administrative remedies" meet "the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (citing *Woodford*, 548 U.S. at 83-84).

While exhausting administrative remedies is mandatory, a prisoner is only expected to exhaust those remedies that are "available."  *Ross v. Blake*, 578 U.S. 632, 638–39 (2016).  There are three circumstances in which an administrative remedy is not feasible and thus forecloses the inmate's duty to exhaust: (1) when an administrative remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use;" and (3) "when prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

"Because failure to exhaust is an affirmative defense, . . . defendants bear the initial burden of establishing, by pointing to legally sufficient source[s] such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (internal quotation marks omitted).  If the defendants satisfy this initial burden, it is then up to the plaintiff to "demonstrate that other factors … rendered a nominally available procedure unavailable as a matter of fact." *Id.*

It is undisputed that the DOC's Administrative Directive 9.6 sets forth the applicable grievance procedure in this case, [*see* Dkt. 32-2 ¶ 57], and that Hackett failed to properly exhaust his administrative remedies under this directive. Namely, it is undisputed he did not submit an Inmate Request Form in writing before filing his May 24, 2020, Level 1 grievance, and—after being told his initial grievance was procedurally improper—he did not file his July 8, 2020, Level 1 grievance within 30 days of the incident.  [*See* Dkt. 32-2 ¶¶ 59–63 (summarizing AD 9.6 procedure); Dkt. 27-8 (Plaintiff's grievances).]   "An 'untimely or otherwise procedurally defective administrative grievance' . . . does not constitute proper exhaustion." *Snyder v. Whittier*, 428 F. App'x 89. 91 (2d Cir. 2011)  (quoting *Woodford*, 548 U.S. at 83–84).  Accordingly, Hackett failed to exhaust his remedies under Administrative Directive 9.6.

Because Defendants have satisfied their initial burden to establish a grievance procedure existed (and Hackett failed to exhaust his remedies under that

procedure), the Court must now decide whether Hackett can prove that the process was nonetheless unavailable.  *See Hubbs*, 788 F.3d at 59.  Hackett claims that the DOC thwarted his ability to take advantage of Administrative Directive 9.6's grievance process through its misrepresentation by omission.  [*See* Dkt. 32-1 (Pl.'s Opp'n) at 5.]  That is, the DOC misrepresented the available administrative remedy, because it failed to inform Hackett that the 2017 Inmate Handbook—which specifically contemplated an alternative remedy for "emergency grievances"—was no longer operative.  In failing to give Hackett the updated Inmate Handbook, the DOC failed to inform him that an emergency grievance procedure no longer existed.

With *Ross v. Blake*, the Supreme Court limited the circumstances in which a plaintiff could show the administrative remedy is unavailable.  Before *Ross*, the Second Circuit permitted a district court to consider "special circumstances" justifying a particular prisoner's failure to properly exhaust.  *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004).  *Ross* reminds  lower courts to adhere to the PLRA's "textual exception"—to decide whether the remedy is "unavailable" to the inmate (<u>not</u> whether the inmate was justified in failing to exhaust a remedy that was available to him).  *See Ross*, 578 U.S. at 641, 648–49.

The *Ross* Court favorably cited several examples in which an administrative remedy is "unavailable" because "officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures."  *Id.* at 644 n.3.  One of these examples—the Fifth Circuit's *Davis v. Hernandez*, 798 F.3d 290, 295 (5th Cir. 2015)—is particularly instructive.  There, the plaintiff testified that he was unaware

14

the second step of the grievance process existed.  *See id.* at 295.  When he inquired about it, a jail staff told him the second step did not exist.  *See id.*  The Fifth Circuit explained that, on the one hand, "courts may *not* deem grievance procedures unavailable merely because an inmate was ignorant of them, so long as the inmate had a fair, reasonable opportunity to apprise himself of the procedures."  *Id.* (emphasis in original).   But on the other hand, "[g]rievance procedures *are* unavailable to an inmate if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process."  *Id.* (emphasis in original).  While the undisputed evidence established the grievance procedure was published in an inmate handbook and explained on jail television, the Fifth Circuit concluded that this was not enough. Because jail staff affirmatively misrepresented the process and the plaintiff relied on the misrepresentation, the process was unavailable to him.  *See id.* at 296.

This Court is also guided by this district's analysis in *Martinez v. Payne*, No. 3:20-cv-00231 (JAM), 2021 WL 3493616 (D. Conn. Aug. 7, 2021), in which, after assessing the evidence, the district court came to the opposite conclusion from the *Davis* court.  *See id.* at *5.  As a background, the New Haven Correctional Center's inmate handbook summarized the administrative remedies available under Administrative Directive 9.6.  *See id.* at *3.  The court reasoned,

> [E]ven if Martinez was not given the handbook and even if I accept that he did not know of the procedure to appeal his SRG designation, courts in this circuit have found in light of the Supreme Court's decision in *Ross* that grievance procedures are not "unavailable" simply because a plaintiff was unaware of the existence of the procedure.

15

*Id.* at *5.   Moreover, upon arrival at New Haven, the plaintiff signed a form acknowledging receipt of the inmate handbook and that he attended an Administrative Remedies Procedure Presentation.   *Id.* at *4.   In other words, the plaintiff may have been "unaware" of the proper procedure but—unlike the *Davis* plaintiff—he could not show that the defendants misrepresented the procedure or otherwise misled him.

This case falls somewhere between *Davis* and *Martinez*, with the balance tipping closer to *Davis.*   Unlike the *Davis* plaintiff who was <u>actively misled</u> by jail staff, *see id.* at 295, there is no evidence that any Osborn staff made an affirmative misrepresentation about the existing remedy.   [*See* Dkt. 32-3 ¶¶ 37–38, 43 *see* Dkt. 34-1 ¶ 7.]   Yet unlike the *Martinez* plaintiff, there is also no evidence that Hackett actually received the operative Inmate Handbook.   Quite the opposite.   Hackett's first grievance is evidence that he was aware of the typical grievance process but he believed the 2017 Inmate Handbook's emergency grievance process applied. He stated, "This is an emergency grievance because things continue to go on that shouldn't when lives are at stake; for this reason the CN 9601 Form is not being sent because this matter must be addressed right away."   [*Id.*]   It is of no moment that Deputy Warden Moore professes, "When an update is made to the Osborn Inmate Handbook, a copy of the updated version <u>is provided</u> to the <u>inmate population</u> at Osborn." [Dkt. 34-1 ¶ 8 (emphasis added).]   This vague sentence does not explain how the information is distributed or whether it was given to Hackett. Put another way, it does not resolve the fact that, when viewing the evidence in the light most favorable to Hackett, he was never given the operative Inmate Handbook.

The DOC's failure to ensure that Hackett received the operative Inmate Handbook not once, but twice, is functionally equivalent to affirmatively misrepresenting the administrative remedies. Accordingly, the Court concludes the DOC's administrative remedies were not available to Hackett.

In the alternative, evidence in this case supports a finding that Osborn's grievance process was opaque. Defendants do not explain how the updated Inmate Handbooks are distributed. They do not establish whether Hackett received an Inmate Handbook. And they do not aver that the old versions are removed. It is therefore possible that multiple versions of the grievance process could be floating around the prison. Were this to be the case, no reasonable person would be able to "discern or navigate" the actual grievance process. *See Ross*, 578 U.S. at 644.

### B.   Eighth Amendment Deliberate Indifference Claim

"To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (describing (a) and (b) as objective and subjective elements).

To satisfy the objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. Deprivation of "basic human needs"—i.e., "food, clothing, medical care, and safe and sanitary living conditions"—violate the

17

Constitution.  *Id.*  Different conditions of confinement can be aggregated if, together, they deprive a person "of a single, identifiable human need."  *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

As for the subjective element, a defendant acts with deliberate indifference when they "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Vega*, 963 F.3d at 273.  However, even if the official had the requisite knowledge and the harm was not ultimately prevented, the official may avoid liability if they "responded reasonably to the risk."  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

### 1.    *Objective Prong*

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."  *Jolly v.* Coughlin, 76 F.3d 468, 477 (2d Cir. 1996).  Courts have found that inmates may face a substantial risk of serious harm absent adequate measures to counter the spread of COVID as it is "undisputed—and, indeed, by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death."  *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020); *Jones v. Westchester Cnty.*, No. 20-CV-08542 (PMH), 2022 WL 1406591, at *3 (S.D.N.Y. May 4, 2022) (collecting cases).  Accordingly, courts within this circuit have found that COVID-19 can pose a substantial risk of serious harm to prisoners if the prison fails to take adequate measures against the spread of the virus.  *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y 2020) (collecting cases).  Thus, under the circumstances of this case, the

Court must decide whether Plaintiff's evidence establishes a substantial risk of serious harm, considering the preventive measures that Osborn has taken. *See Gibson v. Rodriguez*, No. 3:20-CV-953, 2021 WL 4690701, at *5 (D. Conn. Oct. 7, 2021).

Defendants acknowledge that COVID-19 poses a substantial risk of serious harm but argue that Osborn implemented the Central Office's adequate, protective measures which were based, in part, on CDC recommendations. [*See* Dkt. 27-1 at 16.] Defendant compares this case to *Gibson v. Rodriguez*, another case from this District filed by an inmate challenging the same preventive measures implemented at Osborn that the Plaintiff challenges. *Gibson*, at *5. In *Gibson*, the Court found that the plaintiff failed to satisfy the objective element of the deliberate indifference standard because he "offer[ed] no admissible evidence that these procedures were not put in place at Osborn." *Id*., at *6.

This case is distinguishable from *Gibson*. Here, the only evidence establishing Osborn's COVID-19 policies and how they were implemented are declarations from Warden Rodriguez, Deputy Warden Thibeault and Captain Perez. Hackett has submitted his own declaration and declarations from five other laundry workers who refute that Defendants took adequate measures to prevent the spread of COVID-19 insofar as they did not enforce the policies purportedly put in place. To summarize both parties' declarations, the following are the disputed topics: (1) whether the DOC provided inmates with guidance and instructions about staying safe from COVID-19, including through social distancing, hand washing, and reporting symptoms, [*see* Dkt. 32-2 ¶ 13]; (2) whether and when inmates were

provided with cloth and/or surgical masks, [*see id.* ¶¶ 14, 34]; (3) whether and when inmates were provided with free bars of soap, [*see id.* ¶ 17]; (4) the frequency with which the facility's common areas were cleaned and disinfected, including showers and sleeping areas [*see id.* ¶¶ 17–18]; (5) whether Osborn staff complied with procedure, [*see id.* ¶ 25]; (6) whether Defendants Rodriguez and Thibeault observed failures to comply with protocols, [*see id.* ¶ 26]; (7) whether the laundry workers were required to work, including under threat [*see id.* ¶¶ 33, 38]; (8) whether COVID-positive inmates were house at E-Block and, if they were, whether Defendants Rodriguez and Thibeault were aware of the positive cases, [*see id.* ¶¶ 40–41]; and whether E-Block cells were cleaned and disinfected before the laundry workers were transferred, and, if they were not, whether Defendants Rodriguez and Thibeault were aware of the conditions, [*see id.* ¶ 43].  Because these disputes concern issues of material fact, a reasonable jury could infer that the "conditions of confinement . . . objectively pose an unreasonable risk of serious harm to [Hackett's] current or future health."  *Vega*, 963 F.3d at 273.

## 2.    *Subjective Prong*

With respect to the subjective element, the plaintiff "must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution'" in acting with deliberate indifference. *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  In other words, each Defendant must have "personally knew of and disregarded an excessive risk" to Hackett's life.  *Id.*

In reading the evidence in the light most favorable to Hackett, the Court concludes that a reasonable jury could find each Defendant personally knew of and disregarded excessive risk of harm to his health and safety.  Through Hackett's declarations, the other laundry workers' declarations, and Hackett's grievances, evidence establishes the following:

In March 2020, Defendants Rodriguez, Hines, Thibeault, Munroe, and Blondin came to the laundry shop, and the laundry workers requested PPE.  [Dkt. 32-5 (Pl.'s Opp'n Ex. 3, Lee Decl.) ¶ 6;  Dkt. 32-6 (Pl.'s Opp'n Ex. 4, Browne Decl.) ¶ 10; Dkt. 32-8 (Pl.'s Opp'n Ex. 6, Brown Decl.) ¶ 6.]  These Defendants refused, saying, "We don't have that here."  [Dkt. 32-5 ¶ 6; Dkt. 32-6 ¶ 10.]  Defendant Munroe, however, acknowledged Osborn had PPE and provided it to hallway workers.  [*See* Dkt. 32-5 ¶ 8.]

On April 3, 2020, Defendants Thibeault and Perez informed the laundry workers they would be transferred to E-Block indefinitely.  [*See* Dkt. 32-3 ¶ 16.; Dkt. 32-5 ¶¶ 9–10; Dkt. 32-6 ¶ 12; Dkt. 32-7 (Pl.'s Opp'n Ex. 5, Wade Decl.) ¶ 12.]  They made this decision despite knowing that E-Block did not have windows or other forms of ventilation, whereas H-Block (where the laundry workers had been living) had window ventilation.  [*See* Dkt. 32-3 ¶ 17; Dkt. 32-4 (Pl.'s Opp'n Ex. 2, Walker Decl.) ¶ 9.]  Defendant Thibeault threatened the laundry workers that they would lose their jobs, get tickets, and lose single cell status if they did not move.  [*See* Dkt. 32-3 ¶ 21; Dkt. 32-4 ¶ 12; Dkt. 32-5 ¶ 13; Dkt. 32-6 ¶ 15; Dkt. 32-7 ¶ 16; Dkt. 32-8 ¶ 12.]

Inmates complained to Defendants Rodriguez, Thibeault, and Perez, about staff refusal to wear masks, filthy conditions, and sick inmates.  [*See* Dkt. 32-3 ¶ 13; Dkt. 32-4 ¶¶ 22–23; Dkt. 32-5 ¶¶ 12, 23; Dkt. 32-6 ¶¶ 23–24; Dkt. 32-7 ¶¶ 15, 23; Dkt. 32-8 ¶ 21.]  Multiple laundry workers personally asked Defendants Blondin and Munroe for PPE, but they refused.  [*See* Dkt. 32-3 ¶¶ 14–15; Dkt. 32-4 ¶¶ 6–7; Dkt. 32-7 ¶ 8.]

Based on this evidence, there is a triable issue of fact that all Defendants were explicitly asked for PPE and/or they were directly told about the unsafe conditions, but they nonetheless refused to address the requests or remedy the unsafe conditions.  It is of no moment that Defendants provide their own declarations disputing these facts, because the jury must decide who it believes.  Furthermore, Defendant's evidentiary objections cannot defeat summary judgment because the witnesses will be able to testify at trial about issues within their personal knowledge, including non-hearsay and exceptions to the hearsay rule.  *See generally Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."); Fed. R. Evid. 403(d) & 803.

The Court also notes that Defendants had a duty to seek the assistance of a medical professional in assessing whether Hackett required additional PPE, or any at all, to perform his job safely.  *See Garcia v. Univ. of Conn. Health Care Ctr.*, No. 3:16-CV-852, 2018 WL 5830840, at *15 (D. Conn. Nov. 7, 2018) (Defendants' argument that they acted reasonably in following prison procedure "misse[d] the

22

point" because "corrections officers have a duty to seek a physician's assistance in circumstances that call for medical treatment, including the procurement and administration of medication." (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (holding that indifference to serious medical needs violates the Eighth Amendment, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by *prison guards in intentionally denying or delaying access to medical care* or intentionally interfering with the treatment once prescribed")). Once the laundry workers requested additional PPE, these Defendants had a duty to look into whether that PPE was necessary to ensure the laundry workers' safety.

### C.   Qualified Immunity

Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides government officials with "breathing room to make reasonable but mistaken judgments about open legal questions" and shields "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Accordingly, "[w]hen a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of

defendant's alleged misconduct.'"  *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

An official's conduct violates a clearly established right if, "at the time of the challenged conduct, . . . every 'reasonable official would [have understood] that what he is doing violates that right.'"  *Ashcroft*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  For a right to be clearly established, while "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  The Court must consider this inquiry "in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Therefore, an official is entitled to qualified immunity if, considering the law that was clearly established at the time, the official's conduct was "objectively legally reasonable."  *Taravella*, 599 F.3d at 133 (quoting *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999)).  The objective reasonableness of an official's conduct "is a mixed question of law and fact." *Id.*, 599 F.3d at 134 (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).  At the summary judgment stage, while a conclusion that an official's conduct "was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder."  *Id.*, 599 F.3d at 135 (quoting *Kerman*, 374 F.3d at 109).

Defendants argue that Hackett has not established a violation of his constitutional rights given the unique circumstances of the unprecedented COVID-

19 pandemic.  [*See* Dkt. 27-1 at 42–45.]  Defendants characterize their response as simply following orders from the Central Office and the CDC.  [*See id.* at 43.]

The Court disagrees with Defendants.  The Second Circuit has "held that correctional officials have an affirmative obligation to protect inmates from infectious disease."  *Jolly*, 76 F.3d at 477; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (rejecting in dicta that prison officials may "be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms); *Hutto v. Finney*, 437 U.S. 678, 682–83 (1978) (affirming a finding of an Eighth Amendment violation where a facility housed prisoners, some of whom had infectious diseases, in crowded cells, and "removed and jumbled" their mattresses together each morning before returning them to the cells "at random" at night).  Even at the beginning of the pandemic in March 2020, a reasonable official would have realized that COVID-19 is a serious infectious disease from which prison officials had a duty to protect inmates. This is supported by the fact that officials began implementing policies in response to COVID-19 as early as March 13, 2020.

The Court agrees with the Plaintiff and finds that the qualified immunity analysis turns on disputed facts. Because there are genuine disputes of material fact as to whether Defendants complied with the preventive measures in place at Osborn, the Court denies Defendant's motion for summary judgment on the issue of qualified immunity.

**V.      CONCLUSION**

For the foregoing reasons, the Defendant's motion for summary judgment is DENIED as to Plaintiff's Eighth Amendment claims against Defendants Rodriguez, Hines, Thibeault, Munroe, Blondin, and Perez in their individual capacities for deliberate indifference to Plaintiff's need for PPE and for failure to safeguard him from exposure to COVID-19.  Summary judgment is GRANTED as to the remainder of the claims stated in the Initial Review Order, as Plaintiff has either expressly abandoned them or admitted that evidence warrants summary judgment.  [*See* Dkt. 32-1 at 1, 5–6; Dkt. 32-2 ¶¶ 53–54.]  The parties are instructed to file a Joint Trial Memorandum, as directed by the operative Scheduling Order, on or before November 18, 2022.


IT IS SO ORDERED

_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: November 15, 2022

26